FILED _____ _____ RECEIVED
ENTERED _____ _____ SERVED ON
COUNSEL/PARTIES OF RECORD

SEP 1 5 2010

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

1  Paul Sifre
2  3660 Hawking Court
3  Sparks, NV 89436
4

5          UNITED STATES DISTRICT COURT
6              DISTRICT OF NEVADA

**Paul Sifre**

Plaintiff,

        vs.

**Wells Fargo Bank c/o Trustee Corps**

Defendant

Case # _____
                3:10-CV-00572

**PETITION FOR TEMPORARY
INJUNCTION**

7

8                                    Date:  _September 15, 2010_

9  Comes now Paul Sifre, hereinafter referred to as "Petitioner," and moves the court for relief as
10  herein requested:

11                         **PARTIES**
12  Petitioner is Paul Sifre,  3660 Hawking Court, Sparks NV 89436.  Currently Known
13  Defendant(s) are/is:  Wells Fargo Bank c/o Trustees Corps, 30 Corporate Park, Suite 400, Irvine,
14  CA  92606 , by and through its attorney.

15                     **STATEMENT OF CAUSE**
16  Petitioner, entered into a consumer contract for the refinance of a primary residence located at
17  3660 Hawking Court, Sparks NV 89436, hereinafter referred to as the "property."  Defendants,
18  acting in concert and collusion with others, induced Petitioner to enter into a predatory loan
19  agreement with Defendant.

20  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
21  crafted scheme intended to defraud Petitioner.

22  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
23  of the types of tactics used by Defendants to defraud Petitioner.

24  Defendants charged false fees to Petitioner at settlement.

PRELIMINARY INJUNCTION                    1 of 26

Paid Amt $ 350⁰⁰  Date 9|15|10
Receipt # 70028427  Initials ___

25    Defendants used the above referenced false fees to compensate agents of Petitioner in order to
26    induce said agents to breach their fiduciary duty to Petitioner.

27    Defendant's attorney caused to be initiated collection procedures, knowing said collection
28    procedures in the instant action were frivolous as lender is estopped from collection procedures,
29    under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
30    the production of the original promissory note alleged to create a debt.

31    **IN BRIEF**
32    *(Non-factual Statement of Posture and Position)*

33    It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
34    making a number of allegations that, outside the context of the current condition of the real
35    estate industry, may seem somewhat outrageous and counter-intuitive.

36    When Petitioner accuses ordinary individuals of acting in concert and collusion with an
37    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
38    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
39    people, just doing what they have been trained to do, are out to swindle the poor
40    unsuspecting borrower.

41    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
42    committed by people acting in concert and collusion, one with the other. Petitioner has no
43    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
44    that what they were doing was part of an ongoing criminal conspiracy, only that it was,
45    and they, at the very least, kept themselves negligently uninformed of the wrongs they
46    were perpetrating. Petitioner maintains the real culprit is the system itself, including the
47    courts, for failure to strictly enforce the consumer protection laws.

48    **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
49    *(General State of the Real Estate Industry)*

50    ***THE BEST OF INTENTIONS***

51    Prior to the 1980's and 1990's ample government protections were in place to protect
52    <u>consumers</u> and the lending industry from precisely the disaster we now experience.
53    <u>During</u> President Clinton's administration, under the guise of making housing available to

54   the poor, primary protections were relaxed which had the effect of releasing the
55   unscrupulous on the unwary.

56   Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
57   the risk.   Consequently, Americans were engaged in safe and stable home mortgages.
58   With the protections removed, the unscrupulous lenders swooped in and, instead of
59   making loans available to the poor, used the opportunity to convince the unsophisticated
60   American public to do something that had been traditionally taboo; home buyers were
61   convinced to speculate with their homes, their most important investment.

62   Wells Fargo Bank, Ameriquest, Countrywide, and many others swooped in and convinced
63   Americans to sell their homes, get out of their safe mortgage agreements, and speculate
64   with the equity they had gained by purchasing homes they could not afford.   Lenders
65   created loans intended to fail as, under the newly crafted system, the Lender profited more
66   from a mortgage default than from a stable loan.

67   Companies cropped up who called themselves banks when, in fact, they were only either
68   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
69   creating and selling promissory notes.   As will be demonstrated, these companies then
70   profited from the failure of the underlying loans.

71   ***HOW IT WORKS***

72   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
73   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
74   investor.

75   People would set up mortgage companies buy securing a large loan from one of the major
76   banks, then convert that loan into 20 and 30 year mortgages.   In order to accomplish this
77   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
78   lender who would secure the title from the seller using the borrowed bank funds for that
79   purpose, and then trade the title to the buyer in exchange for a promissory note.

80   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
81   6 months.   As soon as the closing is consummated, the promissory note is sold to an
82   investor pool.

83   Using the instant case as an example, a $338,516.00 note at 5.9419%%  interest over 30
84   years will produce $351,022.39     The lender can then offer to the investor the security

PRELIMINARY INJUNCTION            3 of 26

85     instrument (promissory note) at say 50% of it's future value.  The investor will, over the
86     life of the note, less approximately 3.00% servicing fees, realize $354,639.61 .  The lender
87     can then pay back the bank and retain a handsome profit in the amount of $38,060.08.  The
88     lender, however, is not done with the deal.

89     The lender signed over the promissory note to the investor at the time of the trade, but did
90     not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
91     Court addressed this issue and stated that such a transaction was certainly legal.  However,
92     it created a fatal flaw as the holder of the lien document, at time of sale of the security
93     instrument, received consideration in excess of the lien amount.  Since the lien holder
94     received consideration, he could not be harmed.  Therefore the lien became an
95     unenforceable document.

96     This begs the question: if keeping the lien would render it void, why would the lender not
97     simply transfer the lien with the promissory note?  The reason is because the lender will
98     hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
99     amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
100     liability.  The lender, by this maneuver, gets consideration a second time.  And still the
101     lender is not done profiting from the deal.

102     After sale of the promissory note, the lender remains as the servicer for the investor.  The
103     lender will receive 3% of each payment the lender collects and renders to the investor
104     pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
105     that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
106     foreclosure.

107     The lender stands to profit more from a note that is overly expensive, than from a good
108     stable loan.  And where, you may ask, does all this profit come from?  It comes from the
109     equity the borrower had built up in the home.  And still the lender is not finished profiting
110     from the deal.

111     Another nail was driven in the American financial coffin when on the last day Congress
112     was in session in 2000 when restrictions that had been in place since the economic
113     collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
114     without actually buying them.  This unbridled speculation led directly to an economic
115     collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
116     unscrupulous lenders got their way on the last day of the congressional session.  Congress

117   removed the restriction banning derivatives and again allowed the practice, this time
118   taking only 8 years to crash the stock market.   This practice allowed the lender to profit
119   further from the loan by betting on the failure of the security instrument he had just sold to
120   the unwary investor, thus furthering the purpose of the lender to profit from both the
121   borrower (consumer) and the investor.

122   The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
123   bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
124   accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
125   were acting under the guise of government regulation and, therefore, the borrower had
126   reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
127   protect the consumer from just this kind of abuse were simply being ignored.

128   The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
129   the referral of the client to the lender by a person acting as an agent for the borrower.
130   Hereinafter, the person or entity who receives any portion of the yield spread premium, or
131   a commission of any kind consequent to securing the loan agreement through from the
132   borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
133   law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
134   seeking out a lender for the borrower, would seek the best deal for his client rather than
135   who would pay him the most.  That was the intent, but not the reality.  The reality is that
136   Agents never come away from the table with less than 2% or 3% of the principal.  This is
137   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
138   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
139   product than the borrower qualifies for.  This will generate more profits for the lender and,
140   consequently, for the Agent.

141   It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
142   the fair market price.  This allows the lender to increase the cost of the loan product and
143   give the impression that the borrower is justified in making the purchase.

144   The lender then charges the borrower an underwriting fee in order to convince the
145   borrower that someone with knowledge has gone over the conditions of the note and
146   certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
147   deception of the borrower by placing undue stress on the borrower to sign the large stack
148   of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

149   insure the transaction. This trust is systematically violated for the purpose of taking unfair
150   advantage of the borrower.   The entire loan process is a carefully crafted contrive
151   connivance designed and intended to induce the unsophisticated borrower into accepting a
152   loan product that is beyond the borrowers means to repay.  With all this, it should be a
153   surprise to no one that this country is having a real estate crisis.

154                          **PETITIONER WILL PROVE THE FOLLOWING**
155   Petitioner is prepared to prove, by a preponderance of evidence that:

156   • Lender has no legal standing to bring collection or foreclosure claims against the
157      property;

158   • Lender is not a real party in interest in any contract which can claim a collateral
159      interest in the property;

160   • even if Lender were to prove up a contract to which Lender had standing to enforce
161      against Petitioner, no valid lien exists which would give Lender a claim against the
162      property;

163   • even if Lender were to prove up a contract to which Lender had standing to enforce
164      against Petitioner,  said contract was fraudulent in its creation as endorsement was
165      secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
166      the inducement, fraud in the execution, usury, and breaches of contractual and
167      fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
168      Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
169      Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
170      "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
171      'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
172      bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
173      pooled together in a trust fund;

174   • Defendants have concocted a carefully crafted connivance wherein Lender
175      conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
176      by inducing Plaintiff to enter into a predatory loan inflated loan product;

177   • Lender received unjust enrichment in the amount of 5% of each payment made late
178      to Lender while Lender and Lender's assigns acted as servicer of the note;

179       •   Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
180          handling the foreclosure process on a contract Lender designed to have a high
181          probability of default;

182       •   Lender intended to defraud Investor by converting the promissory note into a
183          security instrument and selling same to Investor;

184       •   Lender intended to defraud Investor and the taxpayers of the United States by
185          withholding the lien document from the sale of the promissory note in order that
186          Lender could then hold the lien for three years, then prepare and file Internal
187          Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
188          and deduct same from Lender's income tax obligation;

189       •   Lender defrauded backers of derivatives by betting on the failure of the promissory
190          note the lender designed to default;

191       •   participant Defendants, et al, in the securitization scheme described herein have
192          devised business plans to reap millions of dollars in profits at the expense of
193          Petitioner and others similarly situated.

194                              **PETITIONER SEEKS REMEDY**
195  In addition to seeking compensatory, consequential and other damages, Petitioner seeks
196  declaratory relief as to what (if any) party, entity or individual or group thereof is the
197  owner of the promissory note executed at the time of the loan closing, and whether the
198  Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
199  Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
200  alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

201  ***PETITIONER HAS BEEN HARMED***

202  Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

203  Such harm and detriment includes economic and non-economic damages, and injuries to
204  Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

205  In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
206  equitable relief requested herein is granted.

PRELIMINARY INJUNCTION         7 of 26

207                        **STATEMENT OF CLAIM**

208        ***DEFENDANTS  LACK STANDING***

209             **No evidence of Contractual Obligation**

210    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
211    produce said contract. Even if Defendants produced evidence of the existence of said contract in
212    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
213    that a contract actually existed at one point in time. A copy, considering the present state of
214    technology, could be easily altered. As Lender only created one original and that original was
215    left in the custody of Lender, it was imperative that Lender protect said instrument.

216    In as much as the Lender is required to present the original on demand of Petitioner, there can be
217    no presumption of regularity when the original is not so produced.   In as much as Lender has
218    refused Petitioner's request of the chain of custody of the security instrument in question by
219    refusing to identify all current and past real parties in interest, there is no way to follow said
220    chain of custody to insure, by verified testimony, that no alterations to the original provisions in
221    the contract have been made.   Therefore, the alleged copy of the original is only hearsay
222    evidence that an original document at one time existed. Petitioner maintains that, absent
223    production of admissible evidence of a contractual obligation on the part of Petitioner,
224    Defendants are without standing to invoke the subject matter jurisdiction of the court.

225             **No Proper Evidence of Agency**

226    Defendants claim agency to represent the principal in a contractual agreement involving
227    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
228    pronouncement that agency has been assigned by some person, the true identity and capacity of
229    whom has not been established. Defendants can hardly claim to be agents of a principal then
230    refuse to identify said principal. All claims of agency are made from the mouth of the agent with
231    no attempt to provide admissible evidence from the principal.

232    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
233    court.

234          **Special Purpose Vehicle**

235   Since the entity now claiming agency to represent the holder of the security instrument is not the

236   original lender, Petitioner has reason to believe that the promissory note, upon consummation of

237   the contract, was converted to a security and sold into a special purpose vehicle and now resides

238   in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue

239   Code and as such, cannot be removed from the REMIC as such would be a prohibited

240   transaction.   If the mortgage was part of a special purpose vehicle and was removed on

241   consideration of foreclosure, the real party in interest would necessarily be the trustee of the

242   special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a

243   special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

244   cause to believe defendant is not the proper agent of the real party in interest.

245   *CRIMINAL CONSPIRACY AND THEFT*

246   Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

247   a criminal conspiracy to defraud Petitioner.   Said conspiracy but are not limited to acts of

248   negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

249   acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

250   Petitioner by Lender, which were then used to fund the improper payment of commission fees to

251   Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

252   *AGENT PRACTICED UP-SELLING*

253   By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.   In so

254   doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

255   that Agent was licensed by the state.   Agent further defrauded Petitioner by failing to disclose

256   Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to

257   Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

258   connivances, wherein Agent proactively made knowingly false and misleading statements of

259   alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

260   Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

261   a loan product offered by the Lender.   Said loan product was more expensive than Petitioner

262   could legally afford. Agent acted with full knowledge that Petitioner would have made a

263   different decision had Agent given complete disclosure.

264      *FRAUDULENT INDUCEMENT*

265      Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
266      known, Petitioner could not afford in order to unjustly enrich Lender.

267      *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

268      Said more expensive loan product was calculated to produce a higher return when sold as a
269      security to an investor who was already waiting to purchase the loan as soon as it could be
270      consummated.

271      **Extra Commission for Late Payments**

272      Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
273      that Lender intended Petitioner would have difficulty paying. The industry standard payment to
274      the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
275      borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
276      Thereby, the Lender stands to receive more than double the regular commission on collections if
277      the borrower pays late.

278      **Extra Income for Handling Foreclosure**

279      Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
280      on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
281      receives considerable funds for handling and executing the foreclosure process.

282      **Credit Default Swap Gambling**

283      Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
284      default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
285      designed the loan to fail, betting on said failure is essentially a sure thing.

286      *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

287      Lender sold the security instrument after closing and received consideration in an amount in
288      excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
289      security instrument, Lender separated the lien from said security instrument, creating a fatal and
290      irreparable flaw.

PRELIMINARY INJUNCTION          10 of 26

291  When Lender received consideration while still holding the lien and said consideration was in
292  excess of the amount of the lien, Lender was in a position such that he could not be harmed and
293  could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

294  Since the separation of the lien from the security instrument creates such a considerable concern,
295  said separation certainly begs a question: "Why would the Lender retain the lien when selling the
296  security instrument?"

297  When you follow the money the answer is clear.  The Lender will hold the lien for three years,
298  then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
299  the full amount from Lender's tax liability, thereby, receiving consideration a second time.

300  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
301  lien to the holder of the security, however, the lien once satisfied, does not gain authority just
302  because the holder, after receiving consideration, decides to transfer it to someone else.

303  ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

304  Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
305  information that Lender had as a result of creating the faulty loans sure to default.  Lender was
306  then free to invest on the bet that said loan would default and stood to receive unjust enrichment
307  a third time.  This credit default swap derivative market scheme is almost totally responsible for
308  the stock market disaster we now experience as it was responsible for the stock market crash in
309  1907.

310  ***LENDER CHARGED FALSE FEES***

311  Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
312  Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
313  vendor.

314  Lender charged other fees that were a normal part of doing business and should have been
315  included in the finance charge.

316  Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
317  did Lender or Trustee provide documentation to show that the fees herein listed were valid,
318  necessary, reasonable, and proper to charge Petitioner.

PRELIMINARY INJUNCTION            11 of 26

| 803 | Appraisal | $350.00 |
| 804 | Credit Report | $28.00 |
| 805 | Commitment Fee | $375.00 |
| 806 | Flood Fee | $16.00 |
| 807 | Tax Service Fee | $78.00 |
| 903 | Hazard Insurance Premium | $727.60 |
| 1001 | Hazard Insurance | $121.26 |
| 1003 | City Property Taxes | $1,409.64 |
| 1101 | Settlement fee | $687.50 |
| 1201 | Recording Fee | $40.00 |

319 Debtor is unable to determine whether or not the above fees are valid in accordance with the
320 restrictions provided by the various consumer protection laws. Therefore, please provide; a
321 complete billing from each vendor who provided the above listed services; the complete contact
322 information for each vendor who provided a billed service; clearly stipulate as to the specific
323 service performed; a showing that said service was necessary; a showing that the cost of said
324 service is reasonable; a showing of why said service is not a regular cost of doing business that
325 should rightly be included in the finance charge.

326 The above charges are hereby disputed and deemed unreasonable until such time as said charges
327 have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
328 restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

329 In the event lender fails to properly document the above charges, borrower will consider same as
330 false charges. The effect of the above amounts that borrower would pay over the life of the note
331 will be an overpayment of $41,677.30  This amount will be reduced by the amount of items
332 above when said items are fully documented.

333 ***RESPA PENALTY***

334 From a cursory examination of the records, with the few available, the apparent RESPA
335 violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
336 Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
337 presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
338 No 1st Payment Letter.

339  The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
340 Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
341 statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
342 disclosure letter; loan discount fee disclosure; business insurance company arrangement
343 disclosure; notice of right to rescind.

PRELIMINARY INJUNCTION          12 of 26

344   The courts have held that the borrower does not have to show harm to claim a violation of the
345   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
346   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
347   no more than two thousand, considering the large number enumerated here, it is reasonable to
348   consider that the court will assess the maximum amount for each violation.

349   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
350   the note, borrower has calculated that, the number of violations found in a cursory examination
351   of the note, if deducted from the principal, would result in an overpayment on the part of the
352   borrower, over the life of the note, of $130,273.71.

353   If the violation penalty amounts for each of the unsupported fees listed above are included, the
354   amount by which the borrower would be defrauded is $178,063.08

355   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
356   variance, it appears that lender intended to defraud borrower in the amount of $350,014.09

357       ***LENDER CONSPIRED WITH APPRAISER***

358   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
359   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
360   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
361   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
362   Petitioner.

363       ***LENDER CONSPIRED WITH TRUSTEE***

364   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
365   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
366   fully understand what was being signed.

367   The above referenced closing procedure was a carefully crafted connivance, designed and
368   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
369   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
370   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
371   as required by various consumer protection statutes.

372   ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

373   In the manner in which Defendants have carried on their business enterprises, they have engaged
374   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
375   (Deceptive Practices Act).

376   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
377   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
378   detriment in an amount to be shown according to proof at trial of this matter.

379   ***EQUITABLE TOLLING FOR TILA AND RESPA***

380   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
381   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

382   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
383   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
384   are subject to a one-year limitations period; however, such claims are subject to the equitable
385   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
386   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
387   that given the remedial purpose of TILA, the limitations period should run from the date of
388   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
389   circumstances, suspend the limitations period until the borrower discovers or has reasonable
390   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
391   *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

392   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
393   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
394   that such limitations period may be equitably tolled. The Court of Appeals for the District of
395   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
396   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
397   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
398   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
399   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
400   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
401   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has

402   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
403   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
404   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
405   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
406   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

407   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
408   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
409   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
410   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
411   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
412   any wrongful conduct by the Defendants. Santa Maria. at 1178.

413   ***BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING***
414   ***STANDARDS***

415   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
416   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
417   evidencing title, employment information, and other information and documentation that could
418   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
419   ability to repay a particular loan over both the short and long term. Defendants deviated from and
420   disregarded these standards, particularly with regard to its riskier and more profitable loan
421   products.

422   **Low-Documentation/No-Documentation Loans.**

423   Driven by its desire for market share and a perceived need to maintain competitiveness with the
424   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
425   documentation loan products, including the ARMs and HELOCs described hereinabove, and
426   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
427   the already eased underwriting standards to the point of disregarding such standards. This
428   quickened the loan origination process, allowing for the generation of more and more loans
429   which could then be resold and/or securitized in the secondary market.

430   Defendants marketed no-documentation/low-documentation loan programs that included
431   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated

PRELIMINARY INJUNCTION             15 of 26

432   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
433   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
434   was to be roughly consistent with incomes in the types of jobs in which the borrower was
435   employed. When borrowers were requested to document their income, they were able to do so
436   through information that was less reliable than in a full-documentation loan.

437   For stated income loans, it became standard practice for loan processors, loan officers and
438   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
439   income loans, emphasizing loan origination from a profitability standpoint at the expense of
440   determining the ability of the borrower to repay the loan from an underwriting standpoint,
441   encouraged the overstating and/or fabrication of income.

442   **Easing of Underwriting Standards**

443   In order to produce more loans that could be resold in the secondary mortgage market,
444   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
445   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
446   the base FICO score needed for a SISA loan.

447   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
448   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
449   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
450   income ratios (the amount of monthly income compared to monthly debt service payments and
451   other monthly payment obligations.

452   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
453   term financial circumstances, approving the loan based on the initial fixed rate without taking
454   into account whether the borrower could afford the substantially higher payment that would
455   inevitably be required during the remaining term of the loan.

456   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
457   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
458   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
459   interest payments.

460    As Defendants pushed to expand market share, they eased other basic underwriting standards.
461    For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
462    allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. <u>At the same time that they</u>
463    <u>eased underwriting standards the Defendants also were encouraging consumers to go further into</u>
464    <u>debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed</u>
465    <u>underwriting standards created the aftermarket supply they needed. As a result, the Defendants</u>
466    <u>made it easy for the unwary consumer to take on more debt than he could afford by encouraging</u>
467    <u>unsound financial practices, all the while knowing defaults would occur more and more</u>
468    <u>frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting</u>
469    <u>standards.</u>

470    Defendants knew, or in the exercise of reasonable care should have known, from its own
471    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
472    loans that were likely to end up in default. However, as the pressure mounted to increase market
473    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
474    underwriting guidelines. Such was the environment that loan officers and underwriters were,
475    from time to time, placed in the position of having to justify why they did not approve a loan that
476    failed to meet underwriting criteria.

477    **Risk Layering**

478    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
479    loans with one or more relaxed underwriting standards.

480    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
481    would increase the likelihood of default. Among the risk layering Defendants engaged in were
482    approving HARM loans with little to no down payment, little to no documentation, and high
483    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
484    the loans it promoted to borrowers.

485    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
486    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
487    believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
488    business ignored basic established underwriting standards and acted to mislead the borrower, all
489    to the detriment of the borrower and the consumer of loan products..

490   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,

491   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the

492   business practices described above in paragraphs 30-42 of this Complaint

493   *UNJUST ENRICHMENT*

494   Petitioner is informed and believes that each and all of the Defendants received a benefit at

495   Petitioner's expense, including but not limited to the following: To the Agent, commissions,

496   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

497   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

498   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

499   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

500   percentages of payment proceeds, charges, and other "back end" payments in amounts to be

501   proved at trial; To all participants, the expectation of future revenues from charges, penalties and

502   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

503   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

504   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

505   deprived, and is entitled to restitution in the amount of $350,014.09

506   *CLAIM TO QUIET TITLE.*

507   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

508   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

509   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

510   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

511   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

512   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

513   interest in the Subject Property has been rendered void and that the Defendants are not the holder

514   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

515   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

516         "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

517         scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

518         *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

519         *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

PRELIMINARY INJUNCTION              18 of 26

520     *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
521     *Rptr. 2d 752 (2d Dist. 1995).*

522     ### SUFFICIENCY OF PLEADING

523     Petitioner has sufficiently pled that relief can be granted on each and every one of the
524     Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
525     doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
526     entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
527     allegations of material fact in the complaint are taken as true and construed in the light most
528     favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

529     Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
530     8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
531     theories, and seeks remedies to which Petitioner is entitled.   *Balistreri v. Pacifica Police Dept., 901 F.2d*
532     *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
533     conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
534     should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
535     Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
536     their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
537     relief as requested herein should be granted.

538                              **CAUSES OF ACTION**

539     ### BREACH OF FIDUCIARY DUTY

540     Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
541     duty of care with respect to the mortgage loan transactions and related title activities involving
542     the Trust Property.

543     Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
544     breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
545     all applicable laws governing the loan transactions in which they were involved, including but
546     not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

547     Defendant's breaches of said duties were a direct and proximate cause of economic and non-
548     economic harm and detriment to Petitioner(s).

PRELIMINARY INJUNCTION            19 of 26

549    Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,

550    all to be shown according to proof at trial of this matter.

551    *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

552    Defendants owed a general duty of care with respect to Petitioners, particularly concerning their

553    duty to properly perform due diligence as to the loans and related transactional issues described

554    hereinabove.

555    In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations

556    X and Z promulgated there under to, among other things, provide proper disclosures concerning

557    the terms and conditions of the loans they marketed, to refrain from marketing loans they knew

558    or should have known that borrowers could not afford or maintain, and to avoid paying undue

559    compensation such as "yield spread premiums" to mortgage Agents and loan officers.

560    Defendants knew or in the exercise of reasonable care should have known, that the loan

561    transactions involving Petitioner and other persons similarly situated were defective, unlawful,

562    violative of federal and state laws and regulations, and would subject Petitioner to economic and

563    non-economic harm and other detriment.

564    Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and

565    Z promulgated there under were intended and designed to protect, and the conduct alleged

566    against Defendants is the type of conduct and harm which the referenced statutes and regulations

567    were designed to deter.

568    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and

569    non-economic harm in an amount to be shown according to proof at trial.

570    *AGENT: COMMON LAW FRAUD*

571    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were

572    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable

573    ground for believing them to be true.

574    Agents made these representations with the intention of inducing Petitioner to act in reliance on

575    these representations in the manner hereafter alleged, or with the expectation that Petitioner

576    would so act.

577   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
578   in their negligent misrepresentation, and that various Agents were negligent in not implementing
579   procedures such as underwriting standards oversight that would have prevented various Agents
580   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
581   Defendants.

582   Petitioner is informed and believes that Agent acted in concert and collusion with others named
583   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
584   knowledge or understanding of the terms thereof.

585   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
586   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
587   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
588   proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
589   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
590   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
591   at trial.

592   ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
593   ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

594   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
595   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
596   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
597   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
598   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
599   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

600   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
601   particular significance, in part because of the special relationship between the insurer and the
602   insured. The insurer, when determining whether to settle a claim, must give at least as much
603   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
604   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

605   Likewise, there is a special relationship between an Agent and borrower. "A person who
606   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
      PRELIMINARY INJUNCTION          21 of 26

607   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
608   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
609   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
610   *good faith*. If the *Agent knew or should have known that the Borrower will or has a likelihood of*
611   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
612   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
613   [*Emphasis Added*].

614   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
615   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
616   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
617   product without regard for other more affordable products; (4) Placed Petitioner into a loan
618   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
619   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
620   valid and /or properly documented substitutions and assignments so that Petitioner could
621   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
622   request for documentation of the servicing of Petitioner's loan and the existence and content of
623   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
624   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
625   right under an alleged power of sale because the purported assignment was not recorded and by
626   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
627   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
628   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

629   ### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
630   ### *SEQ*

631   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
632   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
633   Action as though the same were set forth herein.

634   Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
635   the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
636   Property, and entitles Petitioner to damages as proven at trial.

637    ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

638    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
639    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
640    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
641    civilized society.

642    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
643    distress, or acted in conscious and/or reckless disregard of the probability that such distress
644    would occur.

645    Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
646    conduct of Defendants as described hereinabove.

647    As a result of such severe emotional distress, Petitioner suffered economic and non economic
648    harm and detriment, all to be shown according to proof at trial of this matter.

649    Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
650    Petitioner and secure to Petitioner quite title;

651    Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
652    as payments to Defendants based on the fraudulently secured promissory note in an amount to be
653    calculated by Defendants and verified to Petitioner;

654    Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
655    amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
656    equal to $1,050,042.27

657                      **REQUEST FOR TEMPORARY INJUNCTION**

658        Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from
659    foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*,
660    415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

661        There is no adequate remedy at law because once the foreclosure sale has taken place
662    Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third
663    party who will have a right to possession without regard to the claims Plaintiff has against
664    defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.*
665    *Ct. 459, 459 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04*

PRELIMINARY INJUNCTION            23 of 26

666     *(1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89, 879 F. Supp. 719,*

667     *725 (W.D. Ky. 1995.*

668        There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*,

669     403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

670        Defendant has no agency to represent the real party in interest;

671          •   that the alleged real party in interest is unable to prove standing foreclose against and

672             sell the property;

673          •   that the lender committed numerous acts, as listed above, that have the effect of

674             rendering the contract, through which defendant claims authority, void and

675             unenforceable.

676        The threatened harm to plaintiff outweighs the harm that a preliminary injunction would

677     inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from

678     selling the instant property, the defendant an plaintiff will befit as if plaintiff is forced to vacate

679     the property, the property will sit empty for the duration of the action. Plaintiff will suffer loss of

680     the use of said property and will loose opportunity to maintain same and defendant will suffer

681     loss by having to maintain an empty property that cannot be insured.

682        Issuance of a preliminary injunction would not adversely affect the public interest and public

683     policy because there are already a great number of empty houses with the current residential

684     foreclosure mess. Adding more will simply increase the burden on the local as it will create

685     opportunity for vandalism and further other criminal activity.

686        Plaintiff is willing to post a bond in the amount the court deems appropriate.

687        The court should enter this preliminary injunction without notice to defendant because

688     plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted

689     before defendant can be heard as **defendant has informed the plaintiff that a sale of the**

690     **property is imminent.** *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993). If

691     said sale is allowed to take place, Plaintiff will be irreparably harm. {*See O'Connor's Federal*

692     *Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

693       Plaintiff asks the court to set the request for a preliminary injunction for hearing at the

694  earliest possible time.

695                   **CONCLUSION**

696       13.  Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes

697  of action against defendant.  A number of the allegations made by Plaintiff are incontrovertable

698  by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if

699  existing records.  For these reasons, plaintiff asks the court to issue a preliminary injunction

700  preventing defendant from foreclosing on the property.

701                   **PRAYER**

702       15.  For these reasons, plaintiff asks that the court do the following:

703          a.   Defendant be prevented from foreclosing on and selling the property until and

704                   unless defendant prevails in the current litigation.

705          b.   Enter judgment for plaintiff.

706          c.   Award costs of court.

707          d.   Grant any other relief it deems appropriate.

708  **Respectfully Submitted,**
709
710
711  **Paul Sifre**

**VERIFICATION**

712

713

714

715 I, Paul Sifre, do swear and affirm that all statements made herein are true and accurate, in all
716 respects, to the best of my knowledge.

717 Paul Sifre
718 3660 Hawking Court
719 Sparks, NV
720
721 SWORN TO AND SUBSCRIBED BEFORE ME, _Sarah Briody_ , by Paul Sifre,
722 on the 15th day of ~~August~~, 2010, which witnesses my hand and seal of office.
723 September
724 _Sarah Briody_
725 **NOTARY PUBLIC IN AND FOR**
726 **THE STATE OF NEVADA**



SARAH BRIODY
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 03-85173-2 - Expires September 13, 2011